**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

United States of America,

        Plaintiff,

                                          Case No. 10-cr-03104 BB

v.

Paul Beebe, *et al.*,

        Defendants.

**MEMORANDUM OPINION**

On November 10, 2010, a federal grand jury issued an indictment charging Paul Beebe, William Hatch, and Jesse Sanford with conspiring to violate and substantively violating 18 U.S.C. § 249 (2009) by willfully causing bodily injury to V.K. because of his actual and perceived race, color, and national origin. Section 249(a)(1) provides that "[w]hoever, whether or not acting under color of law, willfully causes bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to any person, because of the actual or perceived race, color, religion, or national origin of any person" may be subject to criminal punishment. Defendants have moved to dismiss the indictment, urging that section 249(a)(1), which was passed pursuant to the Thirteenth Amendment, exceeds the constitutional power of Congress.  For the reasons explained below, the Court concludes that the Thirteenth Amendment, Section Two, provided Congress with ample authority to pass section 249(a)(1). Consequently, Defendants' motion to dismiss the indictment (Doc. 59) is DENIED.

<u>**Factual Background**</u>

According to the indictment, Defendants Paul Beebe, William Hatch, and Jesse Sanford together harassed and assaulted V.K., a cognitively disabled young adult Navajo man. Paul Beebe

is allegedly a self-proclaimed white supremacist. His apartment is adorned with Nazi memorabilia and other belongings representing "white pride," including a large swastika flag, a woven symbol with a swastika hanging above his bed, and a baseball bat bearing a swastika. William Hatch and Jesse Sanford work with Paul Beebe.

During the night of April 29 and the early morning of April 30, 2010, Paul Beebe was working at McDonald's in Farmington, New Mexico. V.K., a mentally disabled Navajo man, came into the restaurant at some point and Paul took V.K. back to Paul's apartment. William Hatch and Jesse Sanford then met up with Paul and V.K. at Paul's apartment. Over the course of the next five hours, Mr. Beebe, Mr. Hatch, and Mr. Sanford assaulted V.K. in various ways. Allegedly they shaved a swastika into the hair on the back of V.K.'s head and then wrote the words "White Power" and "KKK" in the lines of the shaved swastika.

Following this assault, Defendants told V.K. that they would brand him. They then made a video recording of V.K. in which he asked to be branded. After recording this video, Defendants heated a wire hanger on the stove and twice pressed it into V.K's skin, searing a swastika into his right bicep. The branding caused pain and scarring. Then Defendants recorded another cell phone video in which V.K. displayed his brand.

Further, Defendants told V.K. that they would draw "feathers" and "native pride" on his back. Instead, Defendants drew testicles, an ejaculating penis, and a pentagram labeled "666" on his back, and also wrote the words "I love cock . . . mmm" on his back. Defendants then recorded a cell phone video of the drawings and while taping, Mr. Beebe asked V.K. if he liked his "feather" and "native pride." The government makes additional allegations in its brief, but because these facts are not in the indictment, the Court disregards them for purposes of this motion.

## Discussion

Pursuant to Rule 12(b)(2), a defendant "may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." Pure issues of law fall within the scope of this rule. *United States v. Flores*, 404 F.3d 320, 325-26 (5th Cir. 2005). However, a court should use caution before dismissing an indictment, since dismissing an indictment "directly encroaches upon the fundamental role of the grand jury." *Whitehouse v. United States Dist. Court*, 53 F.3d 1349, 1359 (1st Cir. 1995). Further, "[a]n indictment should be tested solely on the basis of the allegations made on its face, and such allegations are to be taken as true." *United States v. Todd*, 446 F.3d 1062, 1067 (10th Cir. 2006) (citing *United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994)).

## I.     Validity of Section 249(a)(1) under the Thirteenth Amendment

Section One of the Thirteenth Amendment provides that "[n]either slavery nor involuntary servitude, except as a punishment for a crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend XIII, § 1. Section Two of the amendment then provides that "Congress shall have power to enforce this article by appropriate legislation." *Id.* § 2.

Defendants first argue that the indictment is invalid because Congress exceeded its authority under Section Two of the Thirteenth Amendment in passing 18 U.S.C. § 249(a)(1). Defendants make three basic arguments in support of their claim. First, they argue that the Court should apply the congruence and proportionality standard of *City of Boerne v. Flores*, 521 U.S. 507 (1997), rather than a rational relationship standard, to legislation enacted under Section Two of the Thirteenth Amendment. Second, they argue that the history of slavery and of the Thirteenth Amendment do not support a construction of the phrase "badges and incidents of slavery" that includes racially

3

motivated violence. Finally, they raise federalism concerns and thus implicitly argue that any construction of the Thirteenth Amendment that upholds this legislation would violate the federalism principles enshrined in the Tenth Amendment. Thus, the Court must determine the proper Thirteenth Amendment standard and then the constitutionality of section 249(a)(1) under that standard.

A.    *Standard Applicable to Laws Enacted Under Section Two of the Thirteenth Amendment*

1.    City of Boerne'*s Applicability to the Thirteenth Amendment*

In *Jones v. Alfred H. Mayer Company*, 392 U.S. 409, 440 (1968), the Supreme Court held that "Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery . . . ." Under this rationality standard, the Court held that Congress had not exceeded its authority under Section Two of the Thirteenth Amendment because legislation banning racial discrimination in property conveyances was a rational way to enforce the ban on slavery. *Id.* at 440-41. The Government urges that *Jones* set forth the proper standard under which courts should analyze the constitutionality of legislation enacted pursuant to Section Two of the Thirteenth Amendment: review for rationality.

Defendants concede as much, but then argue that *City of Boerne v. Flores*, a more recent Supreme Court case, departed from the rationale in *Jones*. Defendants argue that the Supreme Court implicitly overruled *Jones* in *City of Boerne* by declaring that under Section Five of the Fourteenth Amendment, Congress may not define the substance of a constitutional provision, but rather may only enforce that provision. 521 U.S. at 519. To that end, the Court declared that pursuant to the Fourteenth Amendment's enforcement clause, "[t]here must be a congruence and proportionality between the [constitutional] injury to be prevented or remedied and the means adopted to that end." *Id.* at 520.

4

Since *City of Boerne* on its face only discusses the Fourteenth Amendment, Defendants' argument hangs on the inference that the enforcement clause of the Thirteenth Amendment contains language very similar to that in the Fourteenth Amendment.[1] Therefore, under Defendants' logic, since the congruence and proportionality test was applied to the enforcement clause of the Fourteenth Amendment, the Court implicitly indicated that this standard should govern every enforcement clause in the Constitution that relies on similar language, including the Thirteenth Amendment. Following this argument to its logical limits, it would also apply to the Fifteenth, Nineteenth, Twenty-Third, Twenty-Fourth, and Twenty-Sixth Amendments, which also employ similar language to that of Section Five of the Fourteenth Amendment.

Thus, to adopt Defendants' position, this Court would have to read *City of Boerne* as creating the sole standard applicable to virtually every enforcement clause in the Constitution. The Court finds nothing in the language of *City of Boerne* that indicates that it silently intended to do something as sweeping as displacing the centuries-old standard of *McCulloch v. Maryland*, 17 U.S. 316 (1819), and overruling at least two long-standing precedents: *Jones v. Alfred H. Mayer Company*, 392 U.S. 409, 440, 443-44 (1968) (applying a rationality standard to the enforcement clause of the Thirteenth Amendment and citing to *McCulloch v. Maryland*'s plainly adapted means, legitimate ends test) and *South Carolina v. Katzenbach*, 383 U.S. 301, 324, 326-27 (1966) (same with respect to the enforcement clause of the Fifteenth Amendment). The Supreme Court did not even mention *Jones v. Alfred H. Mayer Company.* in its *City of Boerne* opinion. Further, it relied on

---

[1] The Fourteenth Amendment's enforcement clause, Section Five, provides that "Congress shall have power to enforce, by appropriate legislation, the provisions of this article." U.S. Const. amend XIV, § 5. The Thirteenth Amendment's enforcement clause, Section Two, similarly provides that "Congress shall have power to enforce this article by appropriate legislation." *Id.* amend. XIII, § 2.

and specifically reaffirmed *Katzenbach* in its analysis. 521 U.S. at 518, 519, 525, 530, 532-33. Applying the presumption that the Supreme Court does not overrule prior precedent *sub silentio*,[2] this Court finds that the Supreme Court in *City of Boerne* did not intend to overrule the standards relating to any other amendment's enforcement provision. Therefore, *Jones* remains the controlling relevant precedent in interpreting Section Two of the Thirteenth Amendment.[3]

2. *Harmonizing City of Boerne and Jones*

Further, even if the Supreme Court did mean to imply that the *City of Boerne* congruence and proportionality test applies to every enforcement clause in the Constitution, that standard is consistent with *Jones*'s continued vitality. Again, this reading of *City of Boerne* comports with the presumption that the Supreme Court does not overrule prior precedent *sub silentio*. *See Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000).

*City of Boerne* and its progeny focus on whether the legislation at issue generally targets constitutional, or rather unconstitutional, conduct. Each of the statutes recently struck down under the *City of Boerne* test have been statutes that primarily targeted actions that the Supreme Court had already held constitutional. In *Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank*, the Court addressed a statute in which it was unlikely "that many of the acts . . . affected by the congressional enactment ha[d] a significant likelihood of being unconstitutional." 527 U.S. 627, 647 (1999). Further, in *Kimel v. Florida Board of Regents*, the statute at issue,

_____

[2] *See Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("The Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*").

[3] *See United States v. Nelson*, 277 F.3d 164, 185 n.20 (2nd Cir. 2002) (noting that *City of Boerne* and its progeny do not apply to Section Two of the Thirteenth Amendment); *Janis v. Nelson*, No. 09-cr-5019, 2009 U.S. Dist. U.S. DIST LEXIS 121086, at *26-*29 (D.S.D. Dec. 30, 2009) (concluding that *City of Boerne* did not overrule the Fifteenth Amendment *Katzenbach* standard *sub silentio*).

"through its broad restriction on the use of age as a discriminating factor, prohibit[ed] substantially more state employment decisions and practices than would likely be held unconstitutional under the applicable equal protection, rational basis standard." 528 U.S. 62, 86 (2000). Finally, in *Board of Trustees of the University of Alabama v. Garrett*, the Court addressed a statute that required states to make special accommodations for the disabled. 531 U.S. 356, 367-68, 370 (2001). The Court made clear that many of the actions underlying the legislation "often [would] not amount to a constitutional violation" and also that "the accommodation duty far exceeds what is constitutionally required." *Id.* at 370, 372.

Further, the Court in *City of Boerne* and its progeny have taken care to distinguish legislation mainly targeting constitutional conduct from legislation primarily targeting unconstitutional conduct, and stressed that the former type of legislation must be more narrowly tailored. *See, e.g.*, *City of Boerne v. Flores*, 521 U.S. 507, 533 (1997). Thus, *City of Boerne* and *Jones* may be harmonized by reading *City of Boerne*'s congruence and proportionality standard as applying to legislation primarily regulating constitutional conduct and the *McCulloch v. Maryland* standard in *Jones* as applying to laws principally targeting unconstitutional conduct.

Initially, the Court must note that "[w]hereas there is a long, well-established, doctrinally rich . . . tradition of judicial interpretation of the substantive protections established by Section One of the Fourteenth Amendment, the meaning of Section One of the Thirteenth Amendment has almost never been addressed directly by the courts, in the absence of specific congressional legislation enacted." *United States v. Nelson*, 277 F.3d 164, 185 n.20 (2nd Cir. 2002). However, the Court is not without tools to determine what is unconstitutional under the Thirteenth Amendment. In *Jones v. Alfred H. Mayer Company*, the Supreme Court analyzed legislation that prohibits racial discrimination in the transfer, purchase, and sale of real property. 392 U.S. 409, 412 (1968). It

deemed restraints on the transfer, sale, or purchase of property as a rational badge of slavery. *Id.* at 440-41. It then applied the *McCulloch v. Maryland* standard to this legislation.

Consequently, to read *City of Boerne* as not overruling *Jones*, this Court interprets the legislation in *Jones* as targeting unconstitutional conduct, such that *City of Boerne*'s congruence and proportionality test would not apply. To do so, it interprets "slavery," banned by Section One of the Thirteenth Amendment, as a system made up of various component parts. *See Bailey v. Alabama*, 219 U.S. 219, 241 (1911) ("The plain intention [of the Thirteenth Amendment] was to abolish slavery of whatever name and form and all its badges and incidents . . . ."); Joyce E. McConnell, Beyond Metaphor: Battered Women, Involuntary Servitude and the Thirteenth Amendment, 4 Yale J.L. & Feminism 207, 213, 220 (1992) (characterizing slavery as a complex social and economic system and noting that Congress sought to abolish not just the legal right to own another human being, "but the characteristics of slavery created through coercion"); Akhil Reed Amar, *Remember the Thirteenth*, 10 Const. Comment 403, 403-05 (1993) (illustrating how one could view the institution of slavery as a system of component features, though personally rejecting this construction). Thus, when Congress targets a "badge or incident of slavery," it is banning, in part, the institution of slavery itself. Thus, legislation targeting a badge or incident of slavery targets the conduct directly banned by Section One of the Thirteenth Amendment, and as such is remedial.

Under the harmonized *City of Boerne-Jones* rubric, then, the Court must first assess what Congress identified as the "badge[] [or] the incident[] of slavery" at issue, 392 U.S. at 440, and then ask whether that determination was "rational[]." *Id.* at 440-41; *see also Fisher v. Shamburg*, 624 F.2d 156, 159 (10th Cir. 1980) (quoting *Jones*, 392 U.S. at 440) (holding that  Congress has the power under the Thirteenth Amendment to "determine what are the badges and incidents of slavery, and the authority to translate that determination into effective legislation"). If the Court finds that

determination rational, it then will find that the legislation principally targets unconstitutional conduct and under *Jones*, apply *McCulloch v. Maryland*'s plainly adapted means, legitimate ends test. In contrast, if it finds the determination irrational, it will find that the legislation primarily targets constitutional conduct, like the Religious Freedom Restoration Act, which targeted conduct that the Supreme Court had held constitutional. For such laws, the Court applies *City of Boerne*'s congruence and proportionality test.

Defendants argue that the history of slavery and of the Thirteenth Amendment do not support a construction of the phrase "badges and incidents of slavery" that would include racially motivated violence. Therefore, the Court now turns to the history of the Thirteenth Amendment in assessing the first question under *Jones*: what Congress identified as a badge of slavery, and whether its determination is rational.

### B.    *Historical Analysis of the Thirteenth Amendment*

In passing section 249(a)(1), Congress found that "[s]lavery and involuntary servitude were enforced, both prior to and after the adoption of the 13th amendment . . . through widespread public and private violence directed at persons because of their race, color, or ancestry, or perceived race, color, or ancestry." § 249(a)(1), Finding (7). They thus found that racially motivated violence is a badge and incident of slavery. Consequently, Congress concluded that "eliminating racially motivated violence is an important means of eliminating, to the extent possible, the badges, incidents, and relics of slavery and involuntary servitude." *Id.*

### 1.    *Historical Overview: Racially Motivated Violence in the Institution of Slavery*

A cursory review of the history of slavery in America demonstrates that Congress' conclusion is not merely rational, but inescapable. According to Professor Ronald L.F. Davis,

9

"American slavery was a brutal system based upon physical force, threats, torture, sexual exploitation, and intimidation." Ronald L.F. Davis, *Slavery in America: Historical Overview*, Slavery in America, http://www.slaveryinamerica.org/history/hs_es_overview.htm (last visited July 15, 2011). "[A] fixed principle of slave law granted masters the unlimited right to abuse their slaves to any extreme of brutality and wantonness as long as the slave survived." Andrew Fede, *Legitimized Violent Slave Abuse in the American South, 1619-1865: A Case Study of Law and Social Change in Six Southern States*, 29 Am. J. Legal Hist. 93, 132, 141-42 (1985); *see also State v. Mann*, 13 N.C. 263, 268 (1829) (reaffirming the right of a master to batter his own slave with impunity); *Commonwealth v. Turner*, 26 Va. 678, 686 (1827) (same).

Racially charged violence, perpetuated by white men against black slaves, was a routine and accepted part of the American slave culture. *See* Ronald Davis, *supra* ("[a]ny black resisting overtly the orders of a slaveholder, or almost any white, could expect immediate and often brutal retaliation"). Accepted forms of violence ranged from whipping to mutilation to branding. *Id.* (including also in the list "kicks to the body, boxing of ears, confinement in corn cribs or tool sheds, branding on the flesh . . . with a hot iron applied for 20 seconds, and mutilation of the body"). In light of this history, this Court could not possibly find irrational Congress' identification of racially motivated violence as a badge of slavery. Rather, the history indicates that such a conclusion is ineluctable.

Not only does history indicate that Congress' conclusion was rational, but case law also identifies racially motivated violence as a badge of slavery. In *Jones v. Alfred H. Mayer Company*, 392 U.S. 409, 443 (1968), the Court expressly overruled *Hodges v. United States*, 203 U.S. 1 (1905) insofar as *Hodges* had held that a racially motivated assault was not a badge or incident of slavery. The Court reasoned that "[t]he conclusion of the majority in *Hodges* rested upon a concept of

congressional power under the Thirteenth Amendment irreconcilable with the position taken by every member of this Court in the *Civil Rights Cases* and incompatible with the history and purpose of the Amendment itself."[4] *Jones*, 392 U.S. at 443; *see also United States v. Kozminski*, 487 U.S. 931, 942 (1988) (concluding that the framers of the Thirteenth Amendment intended to ban "compulsion through physical coercion").

Further, every federal circuit actually faced with the issue has upheld under the Thirteenth Amendment the constitutionality of 18 U.S.C. § 245(b)(2)(B) (2006), a statute that criminalizes intentional racially motivated violence against any person because that person is enjoying a public benefit. *See United States v. Sandstrom*, 594 F.3d 634, 659-60 (8th Cir. 2010); *United States v. Allen*, 341 F.3d 870, 884 (9th Cir. 2003); *United States v. Nelson*, 277 F.3d 164, 190-91 (2d Cir. 2002). The weight of this precedent further confirms that it was rational for Congress to conclude that racially motivated violence is a badge or incident of slavery.

Defendants urge that the framers of the Thirteenth Amendment would not have identified hate crimes as a badge of slavery because the focus of the Thirteenth Amendment "was on ensuring economic rights to former slaves." (Doc. 59, at 17.) Defendants imply that because hate crimes are non-economic in nature, the framers of the Thirteenth Amendment would not have considered them a badge or incident of slavery. However, the Tenth Circuit has rejected the contention that the

---

[4] Defendants argue for the first time in their reply brief that the Court retreated from its rationale in *Jones* in two cases: *Palmer v. Thompson*, 403 U.S. 217 (1971) and *Memphis v. Greene*, 451 U.S. 100 (1981). The Court did not. Rather, the Court clarified that while Congress is empowered to identify and target badges of slavery, absent federal legislation the Court will not *sua sponte* identify such badges and enjoin them under the Thirteenth Amendment. 403 U.S. at 227. In *Palmer*, the Court declined to find facially discriminatory state action to be a badge of slavery in the absence of federal legislation identifying and regulating such conduct as a badge of slavery. *Id.*; *see also Greene*, 451 U.S. at 128-29 (same). In this case, like *Jones* and unlike *Palmer* and *Greene*, the conduct at issue has been identified and targeted by Congress as a badge of slavery.

Thirteenth Amendment is mere economic legislation. *United States v. Kaufman*, 546 F.3d 1242, 1262-63 (10th Cir. 2008) (holding that the Thirteenth Amendment applies to more than just economic relationships). Further, as noted above, the Supreme Court has strongly implied that racially motivated assaults constitute a badge of slavery under the Thirteenth Amendment. *See Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 443 (1968). Thus, Defendants' argument is unavailing.[5]

2.    *Applied History: Navajo-Caucasian Relations in New Mexico*

Finally, with limited exceptions not applicable here, a court will not strike down a statute unless that statute is unconstitutional as applied to the party that argues for unconstitutionality. *See United States v. Raines*, 362 U.S. 17, 21 (1960) ("[O]ne to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional"). The facts involved in this case are not near any grey area of section 249's constitutionality, but rather fall well within the scope of actions that the framers empowered Congress to ban in passing Section Two of the Thirteenth Amendment.

_____

[5] Defendants also cite to *United States v. Harris*, 106 U.S. 629 (1882), for the first time in their reply brief, arguing that this case shows that Congress exceeded its power to regulate badges and incidents of slavery in enacting section 249. (Doc. 80, at 4.) While the Court in *Harris* did strike down under the Thirteenth Amendment a statute that made it a crime to conspire to deprive any person of equal protection of the laws, the Court more recently in *Griffin v. Breckenridge* upheld the civil counterpart of the exact same statute under the Thirteenth Amendment. 403 U.S. 88, 104 (1971). The *Griffin* Court explained that the *Harris* Court's rationale turned on a hypothetical application of the statute that it believed unconstitutional and "a severability rule that required invalidation of an entire statute if any part of it was unconstitutionally overbroad." *Id.* The *Griffin* Court then explained that this severability rule had since been rejected and it further found that the Thirteenth Amendment provided ample authority for the statute. *Id.* at 104-05. Consequently, the Court's rationale in *Griffin* affirmed the broad scope of Thirteenth Amendment authority and clarified that *Harris* should be read consistent with this breadth.

The history of relations between white settlers and the Navajo in New Mexico makes plain that Navajos were enslaved by Europeans throughout the 1800s. *See* James F. Brooks, Captives and Cousins 241-53 (2002); Raymond Friday Locke, The Book of the Navajo 36, 188, 192, 337, 345-46, 349 (6th ed. 2001) (noting that Navajo women were the primary target of Spanish slave raids and cataloguing slave-raiding expeditions in New Mexico against the Navajos specifically in 1821, 1834, 1860, 1862, and generally throughout the Civil War); Lynn Robinson Bailey, Indian Slave Trade in the Southwest 97-102 (1966). Locke quotes Dr. Louis Kennon, a long-time resident of Santa Fe, New Mexico during the 1860s, as speculating that "the Navajos have been the most abused people on the continent" and estimating the number of Navajo slaves in 1862 at between "five to six thousand." *Id.* at 345-46. The history of troubled race relations did not end with the Civil War, however. Its legacy persists to this very day in New Mexico, and specifically in Farmington, where the incident at issue occurred. There have been various documented race-related attacks against Navajos throughout Farmington's history, including the brutal mutilation and murder of three inebriated Navajos in 1974, the beating of an inebriated Navajo man by three white residents in 2006, followed closely by the deadly shooting of a Navajo man by a white police officer six days later. *See* Electa Draper, *Reservation Border Town Has Race Relations on Mind*, Denver Post, Dec. 8, 2006, *available at* http://www.denverpost.com/ci_4800423?source=rss.

Historians have also specifically identified branding as a punishment regularly dealt to slaves. *See* Ronald Davis, *supra* (identifying "branding on the flesh . . . with a hot iron applied for 20 seconds" as a common form of punishment); South Carolina 1712 Act for the Better Ordering and Governing of Negroes and Slaves, *summary available at* http://www.slaveryinamerica.org/geography/slave_laws_SC.htm (noting that under the law, a slave

who twice escaped must be punished with an R branded on the right cheek and that a free black who assisted a runaway was to be branded on his forehead).

The attack at issue here allegedly involved at least one avowed white supremacist and his white friends branding a swastika, a well known symbol of white power, on the arm of a Navajo man in Farmington, New Mexico, an area with a long history of racially motivated violence. Whatever may be said of the limits of Congress' power under Section Two, these facts fall well within the scope of conduct that Section Two of the Thirteenth Amendment empowered Congress to ban. Consequently, this Court easily finds that Congress' determination that racially motivated violence is a badge of slavery is rational.

Defendants argue for the first time in their reply brief that the Thirteenth Amendment "does not permit [Congress] to legislate concerning all private acts of violence based on race, color, religion, or national origin . . . [because] hate crimes against Caucasians, the beneficiaries of the slavery system, cannot be characterized as a legacy of slavery." (Doc. 80, at 8.) Defendants therefore argue that the statute is unconstitutionally overbroad because it protects against assaults targeting persons of any race or national origin. (*Id.* at 5, 9.) The Court normally does not entertain arguments raised for the first time in a reply brief. *United States v. Murray*, 82 F.3d 361, 363 n.3 (10th Cir. 1996). However, the Court will briefly dispose of this argument.

Firstly, as the Court noted in *Griffin v. Breckenridge*, "we need not find the language of [the statute] now before us constitutional in all its possible applications [under the Thirteenth Amendment] in order to uphold its facial constitutionality and its application . . . in this case." 403 U.S. 88, 104 (1971). As discussed in this section, V.K., the victim in this case, was Navajo, and therefore a member of a class that suffered slavery before the passage of the Thirteenth Amendment. Therefore, regardless of whether section 249 could constitutionally apply to a white victim,

inDefendants raise no question of its legitimate applicability to persons like V.K. "who have suffered disabilities as a result of the lingering effects of slavery." (Doc. 80, at 8.)

Further, Defendants are plainly wrong that the statute is overbroad in that racially motivated hate crimes against white victims could not be characterized as a badge of slavery for two reasons. Firstly, as a historical matter, white immigrants from Europe were held in involuntary servitude, alongside Africans and African Americans, in the slave-holding south before the Civil War and also were taken as slaves in the war with the Navajos. *See* Ronald Davis, *supra*; Brooks, *supra*, at 241-44. Therefore, just like Africans and African Americans, Caucasians also were victims of slavery. Secondly, and more importantly, the Thirteenth Amendment bans "slavery" as an institution in its entirety, whatever its form and whomever its victims might be. U.S. Const. amend. XIII, § 1. It nowhere limits that ban to enslavement of Africans and African Americans, or more broadly to enslavement of any class of persons that was enslaved in America before the passage of the Thirteenth Amendment. *See Bailey v. Alabama*, 219 U.S. 219, 240-41 (1911) ("While the immediate concern [of the Thirteenth Amendment] was with African slavery, the Amendment was not limited to that. It was a charter of universal civil freedom for all persons, of whatever race, color or estate, under the flag."). Therefore, Defendants' argument fails.

    *C.*    *Applying* McCulloch v. Maryland

Having found rational the determination of Congress that racially motivated violence is a badge of slavery, the Court now assesses the legislation targeting this conduct under the *McCulloch* standard applied in *Jones*. In *McCulloch v. Maryland*, the Supreme Court upheld Congress' power to establish a national bank as a "necessary and proper" exercise of its legislative powers to lay and collect taxes, borrow money, regulate commerce, declare and conduct a war, and raise and support armies and navies. 17 U.S. 316, 407, 421, 423-24 (1819). Even though the enumerated powers at

issue nowhere specifically listed the power to establish a national bank, the Court found that this power was implicit in Article One, Section Eight's Necessary and Proper Clause, which applies to "all . . . Powers vested by this Constitution in the Government of the United States . . . ." U.S. Const. Art. I, § 8, cl. 18. The Court declared that "the sound construction of the constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people." 17 U.S. at 421.

To that end, Chief Justice Marshall declared that a purported exercise of legislative power should be granted deference so long as "the end be legitimate, . . . within the scope of the constitution, and all means [used] . . . are appropriate, which are plainly adapted to that end, which are not prohibited . . . ." *Id.* The Court then clarified that as long as the purpose of the enforcement legislation appears "calculated to effect any of the objects entrusted to the government, to undertake here to inquire into the degree of its necessity, would be to pass the line which circumscribes the judicial department, and to tread on legislative ground." *Id.* at 423. Therefore, this Court first must assess whether the purpose of the legislation in dispute appears calculated to forward the object of the constitutional command underlying that legislation. It must then assess whether the means employed by the legislation are "plainly adapted," or rationally connected to Congress' express purpose. *Hankins v. Lyght*, 441 F.3d 96, 106 (2d Cir. 2006) (quoting *United States v. Wang Kun Lue*, 134 F.3d 79, 84 (2d Cir. 1998)) ("the 'plainly adapted' standard requires only 'that the effectuating legislation bear a rational relationship to a permissible constitutional end'").

The Supreme Court has found Thirteenth Amendment statutes calculated to enforce the goals of this Amendment where the statute is aimed at eradicating badges and incidents of slavery. In *Jones v. Alfred H. Mayer Company*, the Court upheld, under the Thirteenth Amendment, 42 U.S.C.

§ 1982, which prohibited private racial discrimination in the conveyance of property. 392 U.S. 409, 412, 439 (1968). The Court declared that "[t]he Thirteenth Amendment authorizes Congress not only to outlaw all forms of slavery and involuntary servitude but also to eradicate the last vestiges and incidents of a society half slave and half free . . . ." *Id.* at 443. It finally concluded that the purpose of the legislation was legitimate under *McCulloch* because "[t]he end [of the legislation was] the maintenance of freedom. . . .  A man who enjoys the civil rights mentioned in this bill cannot be reduced to slavery." *Id.* at 443-44.

Further, in *Griffin v. Breckenridge*, the Court upheld, under the Thirteenth Amendment, 42 U. S. C. § 1985 (3), which provides a cause of action to victims of racially discriminatory private conspiracies to deprive the victims of their legal rights. 403 U.S. 88, 92, 104-05 (1971). The Court made clear that "the varieties of private conduct that [Congress] may make criminally punishable or civilly remediable [under the Thirteenth Amendment] extend far beyond the actual imposition of slavery or involuntary servitude." *Id.* at 105. The Court again reiterated that this power includes the power to target and eradicate the badges and incidents of slavery. *Id.* Finally, in *Runyon v. McCrary*, the Court upheld under the Thirteenth Amendment 42 U.S.C.  § 1981, which prohibits racial discrimination in private contracting for educational services. 427 U.S. 160, 163, 179 (1976).

This Court concludes that the purpose of section 249 also appears calculated to further the goal of Section One of the Thirteenth Amendment: to eradicate and keep the institution of slavery permanently suppressed. Congress expressly identified racially motivated violence as a badge or incident of slavery. § 249(a)(1), Finding (7). Since, just as in *Jones* and *Griffin*, the legislation targets a badge or incident of slavery, it contains a legitimate enforcement purpose under the Thirteenth Amendment. Further, the means used, here criminal prosecution of individuals that intentionally physically attack victims because of their race, is "plainly adapted" to the end of

eradicating racially motivated violence, a badge of slavery, by creating a deterrent to committing

such violence. Therefore, this legislation meets the *McCulloch* test and consequently is valid under

the Thirteenth Amendment.[6]

       D.     *Federalism Concerns and the Tenth Amendment*

In a final attack on the constitutionality of section 249 under the Thirteenth Amendment,

Defendants argue that this statute impermissibly encroaches on state authority to punish violent

crimes. (Doc. 59, at 10-11.) Defendants cite to *United States v. Morrison*, 529 U.S. 598, 607 (2000)

and *United States v. Lopez*, 514 U.S. 549, 564, 566 (1995). They argue that these cases stand for the

proposition that the punishment of crimes is "the province of the States" and intrusion into this area

*ipso facto* violates the Tenth Amendment. (Doc. 59, at 11-13.) Defendants grossly overstate the

breadth of *Morrison* and *Lopez*.

---

[6] Because both parties made efforts to analyze this statute under the *City of Boerne* congruence and proportionality test, the Court notes that this legislation would also survive under *City of Boerne*. Under this test, the Court looks to the extent of the constitutional violations documented by Congress. *See Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 368 (2001). Defendants imply that the relevant misconduct must be that of the states, and points out that Congress failed to show serious under-enforcement of hate crimes by the states. (Doc. 59, at 13-14, 16.) Defendants are mistaken. Because the Thirteenth Amendment regulates both private and state action, the relevant conduct is that of private actors as well as states.

Here, Congress found that "[t]he incidence of violence motivated by the actual or perceived race, color, religion, national origin, gender, sexual orientation, gender identity, or disability of the victim poses a serious national problem." 18 U.S.C. § 249(a)(1), Finding (1). Congress heard evidence about the prevalence of hate crimes and the House Report on this bill notes that "[s]ince 1991, the FBI has identified over 118,000 reported violent hate crimes." H.R. Rep. No. 111-86, pt. 1 at 5 (2009). Further, the report notes that in 2007 alone, the FBI had documented more than 7,600 hate crimes. *Id.* Congress' response to this injury is limited; they authorize criminal prosecution for bias-motivated physical attacks only upon certification by the Attorney General that the state has failed to prosecute or that federal prosecution would further federal interests. § 249(b). Such a measured response to this serious problem is congruent and proportional under *City of Boerne*.

The Supreme Court has expressly stated that "[i]f a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States." *New York* v. *United States*, 505 U.S. 144, 155 (1992). Thus, when Congress passed Section Two of the Thirteenth Amendment and expressly delegated to Congress power to enforce the ban on slavery, the states could no longer claim any reserved exclusive power over this area. While the proponents of the laws in *Morrison* and *Lopez* argued that those laws were proper exercises of federal authority under the Commerce Clause, each law's links to interstate commerce were very attenuated. *See Morrison*, 529 U.S. at 615-18; *Lopez*, 514 U.S. at 561, 563, 567. In contrast, section 249(a)(1)'s link to the Thirteenth Amendment is far tighter, because, as discussed above, it targets directly a badge of slavery. Therefore, the Tenth Amendment does not come into play.[7]

As the Fourth Circuit has explained, "[f]ederal laws criminalizing conduct within traditional areas of state law, whether the states criminalize the same conduct or decline to criminalize it, are of course commonplace under the dual-sovereign concept and involve no infringement per se of states' sovereignty in the administration of their criminal laws." *United States v. Johnson*, 114 F.3d 476, 481 (4th Cir. 1997). "Legislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it . . . intrudes into 'legislative spheres of autonomy previously reserved to the States.'" *City of Boerne v. Flores*, 521 U.S. 507, 518 (1997) (quoting *Fitzpatrick v. Bitzer*, 427 U.S. 445, 455 (1976)). Because the Court

---

[7] Further, it is unclear that the Tenth Amendment's federalist concerns limit the Thirteenth Amendment to the same extent that they limit the Commerce Clause, because unlike the Commerce Clause, the Thirteenth Amendment was passed after the Tenth Amendment and enacted a direct command on the states and individuals alike. *Cf. Fitzpatrick v. Bitzer*, 427 U.S. 445, 455-56 (1976) (holding that Section Five of the Fourteenth Amendment, unlike the Commerce Clause, limited Eleventh Amendment immunity because the framers of the Civil War Amendments intended to expand Congress' powers, "with the corresponding diminution of state sovereignty").

finds that section 249(a)(1) remedies constitutional violations under the Thirteenth Amendment, it

concludes that there is no Tenth Amendment violation here.

## II.     Validity of Section 249(a)(1) under the Fifth Amendment's Equal Protection Component

Defendants next argue that section 249(a)(1) violates the equal protection component of the

Fifth Amendment. (Doc. 59, at 20-21.) They claim that this statute "creates race-based

classifications," in violation of the Fifth Amendment. The Government counters that section 249

does not make race-based classifications, but rather addresses a race-related matter in a racially

neutral fashion. (Doc. 70, at 18-19.) The Government's characterization is correct.

Section 249(a)(1) provides that "[w]hoever, whether or not acting under color of law,

willfully causes bodily injury to any person or, through the use of fire, a firearm, a dangerous

weapon, or an explosive or incendiary device, attempts to cause bodily injury to any person, because

of the actual or perceived race, color, religion, or national origin of any person" may be subject to

criminal punishment. The statute does not specify what "race, color, religion, or national origin" the

victim must be for the action to be criminally punishable; rather, the statute applies to crimes against

victims of all races, colors, etcetera victimized on the basis of race, etcetera. Because the statute

addresses this race-related issue in a racially neutral manner, it raises no equal protection issue. *See*

*Crawford v. Bd. of Educ.*, 458 U.S. 527, 538 (1982) ("the Court has recognized that a distinction

may exist between state action that discriminates on the basis of race and state action that addresses,

in neutral fashion, race-related matters"); *Valeria v. Davis*, 307 F.3d 1036, 1042 (9th Cir. 2002)

(declaring that state action that facially provides for different treatment based on a person's

particular race requires strict scrutiny, while actions that address race-related matters in a neutral

fashion do not).

Finally, Defendants argue for the first time in their reply brief that "because Congress was authorized by the Thirteenth Amendment to extend protection only to members of groups disadvantaged by the legacy of slavery," section 249(a)(1) "effectively does require use of racial classifications that necessitate application of strict scrutiny under equal protection principles." (Doc. 80, at 18.) As the Court stated in *Bailey v. Alabama*, "[w]hile the immediate concern [of the Thirteenth Amendment] was with African slavery, the Amendment was not limited to that. It was a charter of universal civil freedom for all persons, of whatever race, color or estate, under the flag." 219 U.S. 219, 240-41 (1911). Consequently, Congress is not limited to only protecting members of groups disadvantaged by the legacy of slavery, but rather may target racially motivated conduct against persons of any race, color, or national origin that constitutes a badge of slavery. Therefore, Defendants' argument cannot shield them from prosecution.

## III.   Validity of Section 249(a)(1) under the Commerce Clause and Fourteenth Amendment

Defendants finally argue that section 249(a)(1) exceeds Congress' powers under the Commerce Clause and under Section Five of the Fourteenth Amendment. (Doc. 59, at 21-23.) The Government responds that Congress did not purport to pass this statute under either the Commerce Clause or the Fourteenth Amendment, but rather passed this legislation pursuant to its Thirteenth Amendment powers. (Doc. 70, at 5, 19.) Because the Court has already upheld the constitutionality of section 249(a)(1) under the Thirteenth Amendment, and because the Government does not attempt to justify this legislation under either of these constitutional powers, the Court finds it unnecessary to consider this argument.

Dated: August 4, 2011

**BRUCE D. BLACK**
**UNITED STATES DISTRICT JUDGE**

21